UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Docket No.: 24-cr-10011-IT |
| ) | |
| CHUKWUNONSO OBIORA   ) | |

## SENTENCING MEMORANDUM

Chukwunonso Obiora appears for sentencing having pleaded guilty to two crimes: (1) conspiracy to obtain a passport through false statements, and (2) conspiracy to engage in money laundering. The first offense involved Mr. Obiora's procurement of a passport from a family member in order to reenter the United States after having been removed. The second offense involved Mr. Obiora coordinating with several coconspirators to open bank accounts for the purpose of receiving the proceeds of business email compromise (BEC) schemes. Mr. Obiora played no role in the BEC fraud directly. His role was limited to moving the proceeds of those schemes from one account to another—which he accomplished by recruiting additional co-conspirators—in exchange for a cut of the profits. Mr. Obiora's crime were admittedly serious and merit stiff punishment. However, the defense contends that the advisory guidelines sentencing range of 188-235 months is unduly punitive, owing in large part to the degree to which the operative guidelines treats loss. In view of his relative culpability and the sentencing factors enumerated in 18 U.S.C. § 3553(a), Mr. Obiora requests that the Court impose a sentence of 84 months imprisonment.

## GUIDELINES CALCULATION

The court must "begin sentencing proceedings by correctly calculating the applicable Guideline range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The parties agree that Mr. Obiora's total offense level, after accounting for acceptance of responsibility, is 31. Because he falls in Criminal History Category VI, the advisory guidelines sentencing range is 188-235

months imprisonment. This calculation is undisputed, although it will be argued below that the applicable guideline's emphasis on loss is an imperfect measure of culpability.

## OBIORA'S PERSONAL HISTORY AND CHARACTERISTICS

Chukwunonso Obiora came to the United States at a young age from war-torn Nigeria. He describes his journey to the United States "as a blessing and a curse." *Chukwunonso Obiora Letter.* It was a blessing in that his family escaped the dangers of their home country and found refuge in the United States. While the family was not well off by any means, both of his parents were able to find work. Mr. Obiora quickly learned English and assimilated into American culture. His parents describe him as a good student who was also involved in sports, particularly football.

Sadly, though, Mr. Obiora's story is not the archetypal feel-good story of integration and eventual success. Mr. Obiora entered the United States without documentation and never subsequently attained any form of lawful status. His lack of status limited his ability to obtain a driver's license, further his education, and obtain lawful employment. This, in turn, led him to support himself through illegal activities. While Mr. Obiora acknowledges that he has often made poor life choices, it is also true that his status an undocumented immigrant created barriers to success.

Moreover, as a young man, it became apparent that Mr. Obiora suffered from significant psychiatric issues. His mother writes that he has had "countless episodes leading him in and out of mental institutions." *Ifeoma Obiora Letter.* His father writes that when Mr. Obiora "stops taking his medications his cognitive and judgment will be off balance." *Ikechukwu Obiora Letter.* Both of his parents are quick to point out, though, that despite all of his difficulties, Mr. Obiora is still a valued family member and dedicated father. He and his domestic partner, Haate Brown, share two children. She too relates that there is a "different side" of Mr. Obiora, one that

is "helpful, selfless, and caring." *Haate Brown Letter*. She writes of how he helped her mother during cancer treatments and of the quality time he spent with the children playing board games and reading bedtime stories. *Id.*

In December of 2021, Mr. Obiora was deported to Nigeria—a country he had virtually no memory of and where none of his immediate family resided. He had little support and his mental health needs were unmet. He suffered from schizophrenic episodes and at one point was hospitalized. Worse still, his status as a foreigner known to have family members in the United States made him a target for kidnappers.[1] In 2022, he was abducted and held for ransom. While his family was eventually able to pay the ransom and arrange for his release, the incident left him traumatized and contributed to his decision to attempt to reenter the United States.

## ARGUMENT

I.   **USSG § 2B1.1 places unwarranted emphasis on loss and does not reflect Mr. Obiora's level of culpability.**

After *Booker*, the Court is required to consider the actual nature of the offense in equal measure with the advisory guideline sentencing range. 18 U.S.C. § 3553(a)(1) & (4). Thus, the issue before the Court in this sentencing is whether the nominal guideline sentencing range – which calls for imprisonment of 188 to 235 months, roughly 15 to 20 years – is proportional to the offense and Mr. Obiora's individual culpability. The defense contends it is not, owing in large part to USSG § 2B1.1's treatment of loss.

The Sentencing Commission's decision to employ notions of loss to culpability has long been criticized. See, e.g., United States v. Emmenegger, 329 F.Supp.2d 416, 427-28 (S.D.N.Y. 2004) (fraud guidelines "place undue weight on the amount of loss involved in the fraud," which

---

[1] NPR recently reported that kidnapping is an "epidemic" in Nigeria. See https://www.npr.org/2024/04/09/1241997352/nigeria-kidnap-mass-abduction-chibok-girls.

in many cases "is a kind of accident" and thus "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) ("inordinate emphasis" on loss as measure of culpability unexplained by the Sentencing Commission). The resulting high guideline sentencing ranges with weak and unexplained correlations to the sentencing goals of 18 U.S.C. § 3553(a) have been exacerbated by the "unplanned upward drift" of sentences generated by both perceived and specific directives of Congress. See Frank O. Bowman III, *Pour Encourager Les Autres?,* 1 Ohio State J. Crim. L. 373, 387 (2004).

The sentencing landscape has changed significantly in the light of *Booker* and its progeny and district courts are permitted to, and, in the appropriate case directed to, consider its disagreement with the Sentencing Commission's underlying guideline sentencing policy as it is expressed in a particular case. *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007). In the years since *Booker*, numerous courts have repeatedly questioned the fraud guideline, finding its emphasis of loss to be "fundamentally flawed." *See*, e.g*., United States v. Moody*, 2013 U.S. Dist. LEXIS 109506, at *14 (D. Colo. Aug. 5, 2013).   Federal courts in New York, which see an unusually large number of white collar cases, have been among the most outspoken.  After study, one such judge concluded that the "loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."  *United States v. Johnson*, 2018 U.S. Dist. LEXIS 71257 at *11–12 (E.D.N.Y. Apr. 26, 2018).

The case for a sentence below the nominally applicable guideline sentencing range is particularly strong where, as here, the defendant played a compartmentalized role in the offense. Mr. Obiora did not participate in the business email compromise (BEC) scheme.  He did not do the hacking and had no direct involvement in the initial theft of funds from the victim

- 4 -

companies. Rather, his role was limited to establishing bank accounts through which the BEC proceeds could be routed.

Moreover, although the loss amount of approximately 6.5 million dollars is not contested, Mr. Obiora hardly profited to that degree. The BEC profits were divvied up among the various coconspirators. As is reflected in the presentence report, the splits varied from to transaction to transaction but Mr. Obiora and his U.S. based coconspirators could generally expect to receive at least 40% of the proceeds. While 40% of 6.5 million dollars is not a negligible amount of money, it must also be remembered that proceeds were again shared between Mr. Obiora and various co-conspirators—i.e., the account holders. The text messages between Mr. Obiora and co-conspirators underscore this point. One September 2, 2020 message from Mr. Obiora made the terms explicit: "60% go to me u and da account owner." PSR ¶ 28(p), fn. 1. In this manner, the amount of profit to Mr. Obiora personally was a fraction of the overall loss amount.

But § 2B1.1 makes no such distinction. A mechanical application of § 2B1.1 treats Mr. Obiora no differently than if he had been exclusively responsible for the BEC thefts and reaped $6.5 million in profits for himself. But of course Mr. Obiora is not the sole actor in this offense and the Court must ultimately fashion a sentence in accordance with 18 U.S.C. § 3553(a), not the advisory guideline.[2] Thus, the Defendant asks the Court to follow many other courts in acknowledging that § 2B1.1, in the circumstances of this case, has limited utility in producing a sentence responsive to 18 U.S.C. § 3553(a).

---

[2] Mr. Obiora was a significant criminal actor, to be sure, and the offenses could not have occurred without middlemen like himself to facilitate the laundering of the criminal proceeds. The defendant does not intend to minimize his role but only to illustrate the shortcomings to § 2B1.1's overemphasis on loss as the driving measure of culpability.

### II. A balanced consideration of the § 3553(a) sentencing factors demonstrates that a sentence well below the advisory guidelines is warranted.

18 U.S.C. § 3553(a) directs that a court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. Mr. Obiora contends that a sentence of 84 months imprisonment, to be followed by a period of three years supervised release, strikes the appropriate balance. Furthermore, he does not object to the orders of restitution and forfeiture sought by the government.

Mr. Obiora fully acknowledges the seriousness of his offenses. BECs are a pernicious form of theft that undoubtedly caused untold disruption and harm to the affected businesses. Mr. Obiora facilitated those crimes by laundering the funds. His recruitment and direction of other co-conspirators is an aggravating factor. Mr. Obiora's record of prior convictions also does him no favors. As the government rightly points out, he stands in a different posture than other first-time offenders sentenced in this District for similar conduct. *See Government Sentencing Memo* at 10-11. And while the Court is required to impose a sentence that will provide for both specific and general deterrence, the defense respectfully suggests that the government's suggestion that a severe sentence is necessary to deter the foreign nationals engaging in BEC schemes (see *Govt. Sentencing Memo* at 9-10) should be treated with some caution. Mr. Obiora's sentence must be individually calibrated within the confines of 18 U.S.C. 3553(a) and not made more severe merely because a large number of individuals committing this crime reside abroad and cannot be prosecuted.

On the other side of the ledger, Mr. Obiora's personal history and characteristics call for some measure of mitigation. Having been brought to this country as a child with no lawful status, Mr. Obiora faced barriers to education and employment and gravitated toward criminal activity. Mental illness has also had a significant deleterious effect on the trajectory of Mr.

Obiora's life.  It is clear from the presentence report (¶¶150-160a) and the letters of his parents that Mr. Obiora's psychiatric issues are longstanding and have had a profound effect on his behavior and decision-making.  He has shown himself, when stable and medicated, to be a valued family member and dedicated father.  Of course, at the conclusion of the Court's sentence, he will not get that chance.  He faces additional time spent in immigration custody and eventually removal from the United States to Nigeria, a country he barely knows.

    The government agrees that these factors support a downward variance, although its recommendation of 168 months is only modestly below the existing guidelines sentencing range.  Because the guidelines range is itself overly punitive and is a product of a flawed approach to loss, and because Mr. Obiora's background and personal circumstances call for a degree of mercy, the defense respectfully seeks a sentence of 84 months.  The proposed sentence represents the most severe sentence yet received by Mr. Obiora, while at the same balancing the competing considerations described above.[3]

 

        Respectfully submitted,
        CHUKWUNONSO OBIORA
        By his Attorney,

        */s/ Scott Lauer*
        Scott Lauer, BBO# 667807
        Assistant Federal Public Defender
        Federal Public Defender Office
        51 Sleeper Street, 5th Floor
        Boston, MA  02210
        617-223-8061 (phone)

---

[3] The lengthiest sentence previously received by Mr. Obiora was a 5-7 state prison sentence, in which he was parole and eventually deported after serving approximately 5 years.  PSR ¶ 129.

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 16, 2024.  A copy is also being provided via email to U.S. Probation Officer Annalia Guerrero.

                                             */s/ Scott Lauer*
                                             Scott Lauer